RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-2238

RONALD BRUCE MYERS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cr-00172—Robert Holmes Bell, District Judge.

Argued: October 18, 2016

Decided and Filed: April 14, 2017

Before: MERRITT, ROGERS, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant. Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant. Jennifer L. McManus, Michael A. MacDonald, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

ROGERS, J., delivered the opinion of the court in which MERRITT, J., joined, and KETHLEDGE, J., joined in part. KETHLEDGE, J. (pp. 21–24), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

ROGERS, Circuit Judge.    Ronald Myers is a serial thief of motor homes.    During his latest spree of thefts, Myers stole at least eight motor homes and then sold them to unsuspecting dealers, posing as their legitimate owner by using clone titles.    A jury convicted him of multiple counts of interstate transportation of stolen vehicles, money laundering, and related conspiracies, and he was sentenced to 360 months' imprisonment.    On appeal, Myers challenges his money-laundering convictions, arguing that the district in which he stole the motor homes was not the proper venue for his money-laundering convictions, because he sold the homes outside of that district.    That challenge fails, both as a statutory argument and as a constitutional argument. Proper venue lay in the trial district under the plain text of the money-laundering statute because Myers was properly charged with his interstate thefts in the district and because Myers participated in removing the theft's proceeds out of the district.    Venue was constitutionally permissible because Myers partially committed concealment money laundering in the trial district by there obtaining possession of the theft's unlawful proceeds, which he would launder elsewhere.    Myers's other appellate arguments—alleging multiplicitous charging, improper denial of self-representation, and erroneous sentencing—also fail.

I.

Ronald Myers was born on November 11, 1958.    Using about 105 other names, eleven other dates of birth, and eleven other social security numbers / employer identification numbers,[1] Myers has devoted his life to stealing.    His criminal record begins at age 12, when he was charged with shoplifting; he was committed to a Utah prison at age 16 for stealing a car; and, all told, he accumulated about 47 arrests as a juvenile.    As an adult, in 1977, and under the name David Lawrence Herdrich, Myers was convicted of stealing a car in Florida after posing as a hitchhiker, and served a year in jail.    In 1982, and under the name Alan Brooks, Myers was convicted of burglarizing a motor home parked at a ski resort, and spent another year in jail.    In

---

[1]During sentencing, when the court asked Myers if those numbers were correct, Myers affirmed that they were, and added, "Actually I believe the number would probably be higher than that."

1983, under the name Michael Howley, Myers was convicted in Kentucky of theft by deception for filing five refund applications for traveler checks, and was sentenced to five years' imprisonment. Myers escaped from the Kentucky prison after just a few months, and in 1987, under the name Richard David Parker, Myers was convicted of conspiring to possess and pass counterfeit Federal Reserve notes, and was transferred to Kentucky to serve the remaining Kentucky sentence.

Sometime in the late 1980s, Myers began focusing his criminal activities on stealing motor homes. In 1988, he was convicted in Georgia of interstate transportation of counterfeit motor home titles, and was sentenced to ten years' imprisonment. He was paroled early in 1996. In 1998, he was convicted in Mississippi of conspiring to transport stolen motor homes, and was sentenced to 44 months' imprisonment. In 2004, he was arrested once again, was later convicted of interstate transportation of a stolen vehicle, and was sentenced to 60 months' imprisonment. Myers has also been jailed repeatedly for violating his parole.

Myers met Walter Nunley, his main coconspirator in this round of thefts, in the early 1990s while they were both imprisoned in Kentucky. In September 2011, when Myers was released after being imprisoned for violating his parole, Nunley picked Myers up at the prison, and the pair went straight to work on stealing motor homes. By the time they were arrested, they had stolen at least eight motor homes across the United States.

Myers and Nunley stole and profited from motor homes using the same general method. Myers would first identify target motor homes online and contact their owners to obtain the motor homes' vehicle identification numbers (VINs), ostensibly to conduct a Carfax search on them. Myers would then forge Virginia titles for the targeted motor homes using their VINs. Using the forged Virginia titles, Myers would next apply for a clone title from either Mississippi or Illinois, as neither state verified that the out-of-state title—here, the forged Virginia title—was real. Myers and Nunley would then steal the targeted motor homes using master keys that they obtained online, pose as legitimate owners of the stolen motor homes using the clone titles from Mississippi or Illinois, and sell the motor homes to unsuspecting dealers.

Myers and Nunley applied that method to steal three motor homes in the Western District of Michigan. They stole a 2006 Country Coach Rembrant in Holland, Michigan, a 2004 Newmar Essex in Kent County, Michigan, and a 2005 Holiday Rambler also in Kent County, Michigan. From other places, Myers and Nunley stole at least five more motor homes.

The criminal partnership unraveled, however, and in March 2013, Nunley began cooperating with an FBI agent who was already investigating their crimes. In a related case, Nunley was convicted of multiple counts of interstate transportation of stolen vehicles, money-laundering conspiracy, and other related counts. He was sentenced to 188 months' imprisonment and ordered to pay about $1.45 million in restitution.

The superseding indictment charged Myers with seven counts. The first count charged the overarching conspiracy to steal motor homes, transport them across state lines, and sell them, all in violation of 18 U.S.C. § 371. The next three counts accused Myers of transporting each of the three motor homes stolen from Michigan and in interstate commerce in violation of 18 U.S.C. § 2312. The fifth count accused Myers of money-laundering conspiracy in violation of 18 U.S.C. § 1956(h). The final two counts accused Myers of substantive concealment money laundering in violation of 18 U.S.C. § 1956 for selling the stolen motor homes by posing as their legitimate owner and for retrieving the sale money in cash.

Myers filed a number of motions before trial. He first moved to represent himself. The district court held a hearing on the motion. During the hearing, as the district court probed Myers's understanding of the risks of representing himself, Myers repeatedly interrupted. When the government objected to Myers's self-representation because Myers had indicated, during his recorded prison calls, that he wanted to represent himself to drag out the trial and to cost the government as much money as possible, Myers admitted to the court: "I said if the government is going to make a mountain out of a molehill, I'll make it Mt. Everest"; "what I'm going to do is put the government's case to challenge, which is going to cost a lot of money."[2] Myers also

---

[2]Similarly, Myers has stated during his prison calls: "This trial's going to cost them a million dollars if they take me up there"; "If they take me there, it's like a little vacation. I love to do legal work, so I'll have some fun"; "But I'll file so much paperwork you guys will spend $100,000 over this. Even if I lose, you guys will lose another couple furlough days for you and your buddies"; "I love to do this stuff. It's what makes me happy. I like doing legal work." During these calls, Myers also variously admitted his guilt, telling his family that there was a stolen

continued to interrupt the court. The district court therefore denied Myers's motion to represent himself, explaining:

> [W]hat I'm concerned about in this case is it's going to get rolling and you're just going to go on and interrupt people, interrupt the government. You're going to interrupt me. You've interrupted me already several times, and we're going to have difficulty seeing that your presumption of innocence is held first in this matter and that the government – let the record reflect this gentleman is shaking his head.
>
> I'm going to deny your motion. I don't think I can – I don't think I can control you if you're representing yourself.

Myers responded that he "intend[ed] to interlocutory appeal immediately." The district court instructed Myers's counsel to continue to represent Myers and asked Myers to "understand" that his "role is to assist her." Myers retorted, "No, sir, Your Honor," "Have a nice day," and tried to walk away from the court. Myers later moved again to represent himself, "apologiz[ing]" for the interruptions and "assur[ing]" the court that "this will not happen again," but the court denied the motion once again, expressing its lack of "inclin[ation] to credit his assurances based on his demonstrated conduct during the last court proceeding." Myers then filed an interlocutory appeal of that denial and also moved to stay the district court's proceedings. We dismissed that appeal because there was no final judgment to review.

Myers also filed a petition for a writ of mandamus in this court to require the district court judge to recuse himself. We denied that petition.

Myers filed another petition for a writ of mandamus in this court to disqualify the prosecutor and to direct the district court to allow Myers to represent himself. We also denied that petition.

Back at the district court, Myers filed a motion to dismiss the indictment "for duplicity," arguing roughly that the government had improperly charged one crime in multiple counts of conspiracies. The district court initially took the motion under advisement. Later, when Myers raised the issue again during trial, the court denied the motion, explaining that the government

---

"baby" in Florida, to "store the RV, you know, the baby," alleging that there was "no giant conspiracy," but instead "[i]t was me by myself committing crimes," and so on.

had properly charged one overarching conspiracy to steal motor homes and three substantive counts of interstate transportation of stolen vehicles for each of the three motor homes stolen from the Western District of Michigan.

Myers also moved to dismiss the money-laundering counts for improper venue on the theory that the alleged money-laundering activities occurred outside of the Western District of Michigan. The district court denied that motion, too. The court reasoned that proper venue lay in the district for money-laundering conspiracy under *Whitfield v. United States*, 543 U.S. 209 (2005), because the government had alleged that several overt acts in furtherance of the money-laundering conspiracy had occurred in the Western District of Michigan. The court further reasoned that proper venue lay in the district for the two substantive counts of concealment money laundering under *United States v. Aronds*, No. 98-1990, 2000 WL 303003 (6th Cir. Mar. 14, 2000) (unpublished table decision), because even though Myers was not charged to have conducted the money laundering in the district, Myers was in any event charged with stealing the motor homes from the Western District of Michigan and transporting those motor homes out of the district, and of laundering specifically the proceeds of those thefts.

After a week-long trial, the jury convicted Myers of all counts.

The presentence report calculated the applicable Guidelines range to be 360 to 1,140 months' imprisonment. That calculation relied in part on enhancements based on the loss amount, the use of sophisticated means under USSG § 2B1.1(b)(10), "sophisticated laundering" under USSG § 2S1.1(b)(3), and Myers's role as an organizer or leader under USSG § 3B1.1(a).

The district court imposed a sentence of 360 months' imprisonment—the bottom of the applicable Guidelines range. The court rejected Myers's various objections to his sentence.

On appeal, Myers challenges both his conviction and his sentence for a variety of reasons. He argues that his money-laundering convictions cannot stand because they were rendered in an improper venue; that the jury was improperly instructed as to that venue; that the charges against him were doubly multiplicitous, because the three counts of interstate transportation of stolen vehicles were multiplicitous with respect to the general conspiracy count, and because the general conspiracy count was multiplicitous with respect to the count of money-

laundering conspiracy; that the district court improperly denied him his right to self-representation; and that the district court erroneously sentenced him by miscalculating the intended loss of his thefts, by applying two enhancements for his use of sophisticated means, by applying an enhancement for his role as a leader, and by failing to apply an amendment to the Guidelines that was pending at the time of his sentencing.

II.

Myers was properly convicted of the money-laundering counts in the Western District of Michigan, notwithstanding his venue arguments. For substantive money laundering, the money-laundering statute permits venue in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(B). Myers committed the underlying crimes, interstate transportations of stolen vehicles, in the Western District of Michigan because he stole three motor homes in that district and transported the stolen motor homes away from that district before selling them and thereby laundering the proceeds of his thefts. Under the plain text of the money-laundering statute, criminal venue lay in the Western District of Michigan therefore not only for the interstate transportation of stolen vehicles, but also for substantive money laundering and money-laundering conspiracy. That statutory extension of venue moreover does not violate the U.S. Constitution's two provisions guaranteeing local prosecution.

As applied to this case, Myers was properly prosecuted in the Western District of Michigan for his "underlying" crimes of interstate transportation of stolen vehicles because he stole the motor homes there and removed them from there. Generally speaking, in criminal prosecutions, proper venue lies in "a district where the offense was committed," Fed. R. Crim. P. 18. The federal crime of interstate transportation of stolen vehicles prohibits "transport[ing] in interstate . . . commerce a motor vehicle . . . [while] knowing the same to have been stolen." 18 U.S.C. § 2312. Myers stole the three motor homes in two towns, both in the Western District of Michigan, *see* 28 U.S.C. § 102(b). Myers then transported the motor homes out of Michigan, by either personally driving them across state lines, or instructing Nunley to do so. Myers

therefore committed interstate transportation of stolen vehicles in Michigan and was properly prosecuted there for those crimes.

Myers also transferred the "proceeds" of his interstate vehicular thefts out of Michigan before selling those "proceeds." The money-laundering statute defines "proceeds" to mean "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). Under that definition, the stolen motor homes themselves were the proceeds of Myers's interstate thefts; they were "propert[ies] . . . obtained . . . through some form of unlawful activity," namely, interstate vehicular thefts under 18 U.S.C. § 2312. So when Myers drove those stolen motor homes out of Michigan, or directed Nunley to do so, he "participated" in transferring the "proceeds" of his thefts out of Michigan. Once outside of Michigan, Myers completed the laundering of those "proceeds" by using the stolen motor homes' clone titles to sell them to unsuspecting dealers and by withdrawing the sale money in cash.

Because Myers was properly prosecuted in Michigan for the "underlying" interstate transportation of stolen vehicles, and because Myers then "participated" in transferring the thefts' "proceeds" out of Michigan before selling them, Myers was also properly prosecuted in Michigan for his concealment money laundering. *See* 18 U.S.C. § 1956(i)(1)(B).

Myers concedes that "[i]f motor homes are proceeds, then venue is proper in the Western District of Michigan" for concealment money laundering. But Myers argues, against plain text, that the stolen motor homes were not "proceeds" under the money-laundering statute, 18 U.S.C. § 1956(c)(9), because "proceeds" should not encompass all "property . . . obtained . . . through some form of unlawful activity," as the text plainly states, 18 U.S.C. § 1956(c)(9), but rather should be limited to "money or other property obtained from a financial transaction involving the stolen motor homes."

That argument, however, not only contravenes the plain text of the quoted venue provision, but also renders the provision largely meaningless. The statute permits venue not only in, as quoted above, "any district where prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the

specified unlawful activity from that district to the district where the financial or monetary transaction is conducted," 18 U.S.C. § 1956(i)(1)(B), but also in "any district in which the financial or monetary transaction is conducted," 18 U.S.C. § 1956(i)(1)(A). If, as Myers argues, "proceeds" are limited to properties "obtained from a financial transaction involving [the stolen good]," then venue under (B) would effectively be no broader than venue under (A), rendering (B) superfluous.

Moreover, the plain meaning of the money-laundering statute's extension of venue does not violate the U.S. Constitution. Two constitutional provisions limit venue in criminal prosecutions to the locus delicti, the place where the crime was committed. Article III requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment similarly requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The Supreme Court has interpreted those provisions to permit prosecution in a district where the crime was committed in part. Myers's concealment money laundering was completed elsewhere, but it was begun and therefore committed in part in the Western District of Michigan, where he stole the motor homes that he would later liquidate, and where he thereby gained possession of the "proceeds of specified unlawful activity" whose source he would later conceal. Because he committed the crime in part in the district, Myers was properly prosecuted for concealment money laundering in the Western District of Michigan.

The Court has held that the "*locus delicti* [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it," by first "identify[ing] the conduct constituting the offense (the nature of the crime)" and then by "discern[ing] the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (quoting *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998)) (internal quotation marks omitted) (alteration in original). The charged crime here is concealment money laundering, in which someone, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts . . . such a financial transaction . . . to conceal or disguise the nature, the location, the source, the

ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). The ultimate criminal act that is prohibited is "conduct[ing]" a financial transaction involving "the proceeds of some form of unlawful activity" to conceal the proceeds' illegal source. To conduct that transaction, however, the launderer must ordinarily have possession of the unlawful proceeds to be laundered. In most cases of concealment money laundering, then, the criminal act of "conduct[ing]" the prohibited financial transaction will include an antecedent conduct of obtaining possession over the unlawful proceeds. That was indeed the case here. Before Myers laundered the proceeds of his theft, he first gained possession of the proceeds—the motor homes themselves—by stealing them, in the Western District of Michigan. As charged against Myers, therefore, the criminalized conduct of concealment money laundering, "conduct[ing]" a financial transaction that conceals the criminal source of "the proceeds of specified unlawful activity," was committed in part in the Western District of Michigan, where he gained possession of the "proceeds of specified unlawful activity."

The Supreme Court has similarly broadly interpreted an analogous statute's criminal conduct. In *Rodriguez-Moreno*, the statute criminalized "us[ing] or carr[ying] a firearm" "during and in relation to any crime of violence," 18 U.S.C. § 924(c)(1). The defendant was tried in New Jersey, to which he took a kidnapped victim, even though he actually kidnapped the victim in Texas, and was proven to have "use[d] or carrie[d] a firearm" only in Maryland. Rejecting the argument that the Constitution required prosecution of the crime in Maryland, the Court reasoned that "the crime of violence element," even though it is "embedded in a prepositional phrase and not expressed in verbs," is still an essential element of a crime, and so the "defendant's violent acts are essential conduct elements." *Rodriguez-Moreno*, 526 U.S. at 280. The Court therefore approved of the defendant's prosecution in New Jersey, where the underlying "crime of violence," the kidnapping, was committed in part, and therefore where the charged crime of "us[ing] or carr[ying] a firearm" "during and in relation to any crime of violence," 18 U.S.C. § 924(c)(1), was committed in part. That reasoning supports our interpretation of the money-laundering statute. While "proceeds of . . . unlawful activity" is not expressed in verbs, concealing the criminal source of those proceeds through a transaction can certainly include

possessing or otherwise exercising control over those proceeds, and obtaining possession or control can therefore be a "part of the conduct constituting the offense."

Because Myers's concealment money laundering, as charged, was proven to have been committed in part in the Western District of Michigan, where he obtained possession of the unlawful proceeds that he would later sell, Myers was properly prosecuted for the whole crime in that district. "[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *United States v. Lombardo*, 241 U.S. 73, 77 (1916). The Supreme Court has therefore repeatedly approved as constitutionally permissible the prosecution of a crime in a district in which the crime was committed only in part. In *Palliser v. United States*, 136 U.S. 257 (1890), where the criminal conduct was mailing a letter to induce an official's dereliction of his duties, and where the defendant sent the letter across state lines from New York to Connecticut, the Court upheld venue in Connecticut, even though the crime of sending the letter was already completed in New York, and the defendant never entered Connecticut. The Court explained: "[T]here can be no doubt at all, if any offense was committed in New York, the offense was continuing to be committed when the letter reached the postmaster in Connecticut." *Id.* at 267. Similarly, in *Armour Packing Co. v. United States*, 209 U.S. 56 (1908), where the criminal conduct was "giv[ing] or receiv[ing] transportation at less than the published rate," *id.* at 80, the Court held the crime was a "continuing" offense that was committed in every state that the transportation occurred, "for transportation is an essential element of the offense, and . . . transportation equally takes place over any and all of the traveled route, and during the transportation the crime is being constantly committed," *id.* at 76. Anticipating the concern that the crime then burdens criminal defendants by exposing them to prosecutions in several states, the Court responded: "To say that this construction may work serious hardship in permitting prosecutions in places distant from the home and remote from the vicinage of the accused is to state an objection to the policy of the law, not to the power of Congress to pass it." *Id.* at 77.

In an unpublished opinion involving nearly identical facts to those before us, we have already interpreted concealment money laundering to permit venue in a district where none of the laundering transactions were proven to have occurred, and we did so relying on a reasoning

that is broader than the reasoning here. In *United States v. Aronds*, No. 98-1990, 2000 WL 303003 (6th Cir. Mar. 14, 2000), the defendant, as here, was charged with multiple counts of interstate transportation of stolen property and of money laundering in a single district, even though he was charged to have conducted the financial transactions exclusively elsewhere. Approving the propriety of criminal venue for money laundering in that case, we explained, "Aronds was also charged with the 'anterior criminal conduct that yielded the funds allegedly laundered.'" *Aronds*, 2000 WL 303003, at *11 (quoting *Cabrales*, 524 U.S. at 7). Here, too, Myers was charged with the anterior criminal conduct, the interstate thefts, that yielded the funds allegedly laundered. But Myers was furthermore charged with obtaining possession in the trial district of the unlawful proceeds that he would launder elsewhere. While *Aronds* is an unpublished opinion, and while in *Aronds* we also relied on the fact that the defendant had forfeited the constitutional venue issue by failing to raise it below, the broadly permissive reasoning in *Aronds* supports the more particularized upholding of constitutional venue in this case.

The Eighth Circuit has also interpreted concealment money laundering to permit venue in a district where none of the laundering transactions were proven to have occurred, relying on an analysis that is also more broadly permissive than our analysis here. In *United States v. Nichols*, 416 F.3d 811, 823–24 (8th Cir. 2005), the defendants fraudulently collected money from victims in California, Tennessee, and Missouri, and laundered the proceeds of their fraud exclusively in California. The government prosecuted them for the underlying fraud and for concealment money laundering in the Western District of Missouri. The Eighth Circuit upheld venue in that case as constitutional, explaining that "[the relevant defendant] was charged with causing money obtained by fraud to be transported from Missouri to California" and also "charged with a conspiracy linking him to fraudulent acts committed in Missouri." *Nichols*, 416 F.3d at 824. Here, too, Myers was charged with participating in transferring the proceeds of his thefts out of Michigan, and also charged with a conspiracy to steal those motor homes and transport them in interstate commerce in Michigan. More specifically, however, Myers also obtained possession of the proceeds of his unlawful activity in Michigan. The reasoning in *Nichols* therefore supports venue more forcefully in this case than it did there.

*United States v. Cabrales*, 524 U.S. 1 (1998), is entirely consistent with our analysis. In that case, the defendant was prosecuted in Missouri for money laundering in Florida, but was not charged with the underlying unlawful activity in Missouri, was not charged with having transported the proceeds of the unlawful activity from Missouri to Florida, and was therefore not charged to have obtained possession of the unlawful proceeds in Missouri. *Id.* at 4–5. Thus the indictment charged the defendant of criminal conduct that occurred exclusively in Florida, and under those limited circumstances, the Court held, the Constitution required prosecution in Florida. *Cabrales* is distinguishable not just because, as we reasoned in *Aronds*, Myers was charged with the anterior criminal conduct that yielded the laundered proceeds, and not just because, as the Eighth Circuit reasoned in *Nichols*, Myers was charged with transferring the unlawful proceeds out of Michigan and charged with an overarching conspiracy that linked Myers to the thefts in Michigan, but also because, as we reason more specifically here, Myers was charged in particular with having gained possession in Michigan of the unlawful proceeds that he would sell elsewhere.

In upholding the Eighth Circuit's judgment in *Cabrales*, the Supreme Court accepted much of the Eighth Circuit's reasoning:

> "Cabrales was not accused of a 'continuing offense,'" the Eighth Circuit said; "[s]he was charged with money laundering, for transactions which began, continued, and were completed only in Florida[.]" "That the money came from Missouri is of no moment," the Court of Appeals next observed, for "Cabrales dealt with it only in Florida." The money-laundering counts "include[d] no act committed by Cabrales in Missouri," the Eighth Circuit emphasized, nor did "the [G]overnment charge that Cabrales transported the money from Missouri to Florida."

*Cabrales*, 524 U.S. at 5 (quoting *United States v. Cabrales*, 109 F.3d 471, 472 (8th Cir. 1997)) (internal citations omitted) (first, third, and fourth alterations in original). The Supreme Court proceeded to distinguish explicitly a case where "the launderer acquired the funds in one district and transported them into another":

> Cabrales is charged in the money-laundering counts with criminal activity "after the fact" of an offense begun and completed by others. . . . Money laundering, the [Eighth Circuit] acknowledged, arguably might rank as a "continuing offense," triable in more than one place, if the launderer acquired the funds in one district

and transported them into another. *But that is tellingly not this case.* In the counts at issue, the Government indicted Cabrales "for transactions which began, continued, and were completed only in Florida." Under these circumstances, venue in Missouri is improper.

*Cabrales*, 524 U.S. at 8 (quoting *Cabrales*, 109 F.3d at 472–73) (emphasis added) (internal citations omitted). The Supreme Court thus distinguished precisely Myers's case, except that the opinion refers to the laundering of "funds" rather than the laundering of "proceeds," a distinction with no constitutionally significant difference. *Cabrales* is accordingly materially different from Myers's case.

Proper venue lay in the Western District of Michigan, also, for Myers's money-laundering conspiracy count, for many of the same reasons. Under the plain text of the money-laundering statute, venue is proper for prosecutions of money-laundering conspiracy "in the district where venue would lie for [substantive money laundering] . . . , or in any other district where an act in furtherance of the . . . conspiracy took place." 18 U.S.C. § 1956(i)(2). Proper venue lay in the district under the first prong of the venue provision because, as explained above, proper venue lay in the Western District of Michigan for Myers's substantive money laundering. Venue for money-laundering conspiracy was also proper in the district under the second prong because the government alleged multiple overt acts by Myers in the district in furtherance of the money-laundering conspiracy: Myers stole three motor homes in the Western District of Michigan that he would later sell elsewhere, posing as their legitimate owner. That venue provision is not unconstitutional because a conspiracy is a continuing offense that is committed everywhere the overt acts are committed. "[The] Court has long held that venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense." *Whitfield v. United States*, 543 U.S. 209, 218 (2005) (citing cases); *see also United States v. Jordan*, 511 F. App'x 554, 566 (6th Cir. 2013).

There is also no reversible error in the district court's instructions to the jury on venue for these money-laundering counts. Myers complains that there was no "instruction telling the jury that it had to find by a preponderance of the evidence that . . . some part of the criminal acts charged in [the money-laundering counts] took place in the Western District of Michigan."

But the verdict form stated that convicting on money-laundering conspiracy was finding that "in Kent County, in the Southern Division of the Western District of Michigan, and other places, the Defendant conspired to engage in money laundering." The court instructed the jury with that same language. The verdict form further stated that convicting on concealment money laundering was finding that "in Kent County, in the Southern Division of the Western District of Michigan, and other places, the defendant engaged in [specified financial transactions] from the Woodforest National Bank." The court instructed the jury with that same language. Those instructions adequately informed the jury that convicting Myers of the money-laundering counts required finding that some part of the criminal conduct took place in the Western District of Michigan. In both sets of instructions, the Western District of Michigan is specified as one of the places where Myers must be found to have committed the criminal conduct—either conspiring to engage in money laundering or engaging in certain financial transactions. A conviction is reversed for errors in jury instructions only where the instructions as a whole were "confusing, misleading or prejudicial." *United States v. Russell*, 595 F.3d 633, 642 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 669 (6th Cir. 2008)) (internal quotation marks omitted). Here, the district court's instructions to the jury on venue were not "confusing, misleading or prejudicial."

## III.

The charges against Myers were not multiplicitous. "'Multiplicity' is charging a single offense in more than one count in an indictment," *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008) (quoting *United States v. Lemons*, 941 F.2d 309, 317 (5th Cir. 1991)) (internal quotation marks omitted), and it therefore "may result in a defendant being punished twice for the same crime," *Swafford*, 512 F.3d at 844 (citing *United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994)). To determine whether charges are multiplicitous, we generally analyze, under *Blockburger v. United States*, 284 U.S. 299 (1932), whether each charge requires proof of a fact that the other charge does not; if each charge does, then the charges accuse different crimes and are therefore not multiplicitous. *See id.*

Myers's interstate vehicular theft counts—one count of conspiring to transport stolen motor homes across state lines in violation of 18 U.S.C. § 371, on the one hand, and three

substantive counts of transporting stolen motor homes across state lines in violation of 18 U.S.C. § 2312, on the other hand—were not multiplicitous. "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1944). Conspiracy requires an agreement, while the substantive crime does not; the substantive crime requires completion, while conspiracy does not. *See id.* at 643–44. While Myers responds that the indictment and the verdict forms stated, for his criminal conduct for the substantive counts, that Myers both "transported" and "conspired to transport" the stolen vehicles, his response points out a distinction that, in this case, makes no difference. The charged crime for the substantive interstate vehicular theft was a violation of 18 U.S.C. § 2312, which does not include a conspiratorial agreement as an element of the crime, and the indictment for those crimes relied on § 371 only to allow *Pinkerton* liability, not because a conspiratorial agreement was an element of the substantive crime. Any error in the verdict forms was invited by Myers himself, who requested the addition of the language that he now challenges. Challenges to such invited errors are forfeited. *See Harris v. Roadway Express., Inc.*, 923 F.2d 59, 60–61 (6th Cir. 1991).

Nor were Myers's two conspiracy counts—the general conspiracy count under 18 U.S.C. § 371 discussed above and the money-laundering conspiracy count under 18 U.S.C. 1956(h)—multiplicitous. As the Court has explained, Congress intended to create a new offense by criminalizing money-laundering conspiracy. Rejecting the argument that § 1956(h) merely increased the penalty for a specific subset of conspiracies under § 371, and rejecting the conclusion that "the Government must continue to prosecute money laundering conspiracies under § 371," the Court held that "[i]t is undisputed that Congress intended § 1956(h) to increase the penalties for money laundering conspiracies," and that "Congress did so precisely by establishing a new offense." *Whitfield v. United States*, 543 U.S. 209, 215–16 (2005). Because § 371 and §1956(h) punish separate offenses, Myers's two conspiracy counts are not multiplicitous.

*Blockburger* analysis supports that conclusion. The general conspiracy statute prohibits a "conspir[acy] . . . to commit any offense against the United States" when coupled with an overt

act, "an act to effect the object of the conspiracy," 18 U.S.C. § 371. The superseding indictment charged Myers of violating 18 U.S.C. § 371 by conspiring "to transport stolen motor vehicles in interstate commerce, contrary to 18 U.S.C. § 2312," and taking multiple overt acts in furtherance of that conspiracy. Money-laundering conspiracy is both narrower and broader than general conspiracy. More narrowly, money-laundering conspiracy prohibits a particular type of criminal agreement: "conspir[acy] to commit any offense defined in" the money-laundering statute. 18 U.S.C. 1956(h). More broadly, money-laundering conspiracy does not require proof of overt acts: "Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction." *Whitfield v. United States*, 543 U.S. 209, 214 (2005). The superseding indictment charged Myers of violating 18 U.S.C. 1956(h) by "engag[ing] in interstate financial transactions with an intent to conceal and disguise the nature, the location, the source, the ownership, and the control of proceeds of a specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)." The superseding indictment also charged Myers with various overt acts, but it did not need to, as held by the Court in *Whitfield*. Each of the two conspiracy counts therefore required proof of a fact that the other did not. The general conspiracy required proof of an overt act, while the money-laundering conspiracy did not; the money-laundering conspiracy required proof of the agreement in particular to commit money laundering, in this case concealment money laundering, while general conspiracy did not. The two conspiracy counts are therefore not multiplicitous.

IV.

The district court did not err in denying Myers's repeated motions to represent himself. While criminal defendants have a constitutional right to self-representation, *Faretta v. California*, 422 U.S. 806, 818 (1975), "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer," *Martinez v. Court of Appeal*, 528 U.S. 152, 162 (2000). To move successfully to represent himself, a criminal defendant must "'voluntarily and intelligently' elect to conduct his own defense," and therefore the defendant "must first be 'made aware of the dangers and disadvantages of self-representation.'" *Id.* at 161–62 (quoting *Faretta*, 422 U.S. at 835) (internal

quotation marks omitted). Here, Myers showed through his words and his actions that he did not sufficiently understand the dangers and disadvantages of self-representation. At the hearing on his self-representation motion, when the district court posed questions to him to probe his understanding of the risks of self-representation, Myers repeatedly interrupted the court, shook his head, and even tried to walk away from the courtroom, despite being an imprisoned defendant. The Government also produced Myers's recorded jail calls in which Myers boasted his plans to drag out trial and to cost the government as much as possible for the prosecution. Indeed, Myers partially executed those plans by filing multiple interlocutory appeals to this court, even though this court clearly lacked jurisdiction to consider those appeals from nonfinal orders. While Myers may have genuinely desired to represent himself, he amply revealed that he did not elect "intelligently" to represent himself with a sufficient understanding "of the dangers and disadvantages of self-representation," both through his inability to participate in orderly trial proceedings, and through his stated plans to use trial as an opportunity to cost the government as much as possible for the prosecution. The district court therefore properly denied Myers's motion to represent himself.

V.

Myers makes multiple challenges to his sentence of 360 months' imprisonment, which was the very bottom of his Guidelines range of 360 to 1,140 months' imprisonment. None succeeds.

Myers first argues that the district court miscalculated the amount of loss by including in its calculation not just the intended loss to the original owners of the stolen motor homes, but also the intended loss to the subsequent purchasers. When Myers stole motor homes, he certainly intended a loss of the value of the stolen motor homes, whether measured by the fair market value of the motor homes, or by the amount that the insurance companies paid to the owners to cover their loss. In this case, however, Myers used the stolen motor homes for his own enjoyment and then sold them to dealers of motor homes, fronting clone titles to pretend to be the motor homes' legitimate owner; and in most cases, as Myers must have known, secondary victims bought those stolen motor homes before Myers's thefts were revealed. When the thefts were revealed, the stolen motor homes were taken away from the secondary victims and returned

to the original owners or their insurance companies. Myers therefore can be said to have intended those losses to the secondary victims. While Myers responds that those secondary victims had a claim against the dealers who sold the motor homes to them, the claim may not be filed or filed successfully, and at least in one case had not been filed by the time of Myers's sentencing. These are the sorts of complications that often accompany loss calculations. Because of such complications, "[t]he court need only make a reasonable estimate of the loss." USSG § 2B1.1 comment. 3. Furthermore, "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," and therefore on review, "the court's loss determination is entitled to appropriate deference." *Id.* We overturn loss determinations only when we find "clear error," leaving us with "the definite and firm conviction that a mistake has been committed." *United States v. Sosebee*, 419 F.3d 451, 455 (6th Cir. 2005) (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)) (internal quotation marks omitted). We are left with no such conviction here.

Myers also challenges as double-counting the district court's applications of two enhancements: Sophisticated Laundering Enhancement, USSG § 2S1.1(b)(3), and "Specific Offense Characteristic," USSG § 2B1.1(b)(10). Myers rests that challenge on a comment to the laundering enhancement, USSG § 2S1.1(b)(3), comment. 5, which instructs not to apply that enhancement if the conduct that triggers the § 2S1.1(b)(3) enhancement is the same conduct that triggered the § 2B1.1(b)(10) enhancement. Here, different conduct triggered the two enhancements. Myers's base offense level for "conspiracy involving stolen property" is properly enhanced under § 2B1.1(b)(10) for the complex scheme he used in stealing and transporting the vehicles, in part by obtaining vehicles' identification numbers and master keys. Myers also went to great lengths to clone titles to those stolen motor homes before selling them by posing as their legitimate owners—and that separate conduct separately qualifies Myers for the Sophisticated Laundering Enhancement under USSG § 2S1.1(b)(3). The district court therefore properly applied both enhancements.

Myers further challenges the application of an upward sentencing adjustment for his role as a leader. That enhancement applies if the defendant was an organizer or leader of a criminal activity that involved either five or more participants or was "otherwise extensive." USSG

§ 3B1.1(a). To determine whether a scheme is "extensive," we consider "whether the combination of knowing and countable non-participants is the functional equivalent of an activity carried out by five criminally responsible participants." *United States v. Anthony*, 280 F.3d 694, 699–701 (6th Cir. 2002). But we do so from a "deferential" stance, mindful that the sentencing judge "is most familiar with the facts and is best situated to determine" how extensive the criminal scheme was. *See United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). Myers's scheme was plainly "extensive." Although he used only two to four knowing participants to effectuate the scheme, the scheme's complexity makes it entirely reasonable to consider it the functional equivalent of a crime with a few more knowing actors. The district court did not err in applying the upward adjustment.

Finally, Myers claims that the district court erred by refusing to consider a then-proposed amendment to the Sentencing Guidelines that would have reduced his offense level by two levels. We have explained that our precedents "allow consideration" of a pending Guidelines amendment, "but do not establish an obligation for the district court to apply those amendments." *United States v. Jimenez*, 517 F. App'x 398, 400 (6th Cir. 2013). Other circuits have held the same. *See United States v. Hayden*, 775 F.3d 847, 850 (7th Cir. 2014); *United States v. Allebach*, 526 F.3d 385, 389 (8th Cir. 2008). What is important is that the "sentence was based on a sentencing range that was properly calculated under the guidelines in effect at the time of [] sentencing." *Jimenez*, 517 F. App'x at 400. Myers's sentence meets that test. *United States v. Taylor*, 648 F.3d 417 (6th Cir. 2011), is easily distinguished. *Taylor* concerned the district court's refusal to consider a Guidelines amendment that took effect after the initial sentence was imposed, but before the case was remanded for resentencing. *See Taylor*, 648 F.3d at 421. Our holding there that the amendment needed to be considered is entirely consistent with the rule that the sentencing judge should base the sentence on the range calculated under the Guidelines as they stand at the time of sentencing.

VI.

We affirm Myers's conviction and sentence.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part. "The Constitution twice safeguards the defendant's venue right[.]" *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III of the Constitution provides that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed[.]" Art. III, § 2, cl. 3. And the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right" to a trial "by an impartial jury of the State and district wherein the crime shall have been committed[.]" Both of those commands were violated as to the concealment money-laundering charges here.

The district in which a crime is committed "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6-7. Specifically, "in performing this inquiry, a court must initially identify the *conduct* constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (emphasis added). In determining where a crime was committed for purposes of constitutional venue, therefore, the court looks to the place of the "conduct elements" rather than to the place of any "circumstance element[s]" of the offense. *Id.* at 280 & n.4.

There is only one conduct element for the offense at issue here. Concealment money-laundering is defined as follows: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, *conducts or attempts to conduct such a financial transaction . . .* knowing that the transaction is designed in whole or in part" to conceal the illicit nature or source of those proceeds, is guilty of concealment money-laundering. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). Thus, as the Supreme Court said in *Cabrales*, the offense of concealment money-laundering "interdict[s] only the financial transactions . . . not the anterior criminal conduct that yielded the funds allegedly laundered." 524 U.S. at 7.

Here, the financial transactions that constituted the charged money-laundering offenses took place at banks in Pennsylvania and Mississippi, respectively. Hence none of those transactions—which is to say, none of the "essential conduct elements[,]" *Rodriguez-Moreno*, 526 U.S. at 280—took place in the Western District of Michigan. Instead that district was the site of the motor-home thefts—which is to say, "the anterior criminal conduct that yielded the funds allegedly laundered." *Cabrales*, 524 U.S. at 7. Thus, per the Supreme Court's decisions in *Cabrales* and *Rodriguez-Moreno*, Myers committed the charged money-laundering offenses in Pennsylvania and Mississippi, rather than the Western District of Michigan. His trial on those charges in Michigan, therefore, violated Article III and the Sixth Amendment of the Constitution. Hence we should reverse those convictions.

In holding to the contrary, the Majority loses sight of the distinction between conduct elements and circumstance ones. The Majority reasons that the charged money-laundering "was committed in part in the Western District of Michigan" because Myers "gained possession of the 'proceeds of specified unlawful activity' [*i.e.,* the motor homes]" there. Maj. Op. at 10. That is factually true but legally irrelevant as to venue—because possession of the unlawful proceeds is merely "a circumstance element" of concealment money-laundering. *Rodriguez-Moreno*, 526 U.S. at 280 n.4. *Laundering* the unlawful proceeds, not possessing them, is what constitutes the offense of concealment money-laundering. That is why the Supreme Court has said this offense "interdict[s] *only the financial transactions . . .* not the anterior criminal conduct that yielded [*i.e.,* allowed the defendant to possess] the funds allegedly laundered." *Cabrales*, 524 U.S. at 7 (emphasis added).

Nor does *Rodriguez-Moreno* support the result in this case. The defendant there was charged with "using or carrying a firearm 'during and in relation to any crime of violence'"—in that case, a kidnaping. 526 U.S. at 280 (quoting 18 U.S.C. § 924(c)(1)). The kidnaping had "begun in Texas and continued in New York, New Jersey, and Maryland." *Id.* at 281. Although the defendant was tried in New Jersey, he argued that venue was proper only in Maryland, which was the only state where he had used the gun. The Supreme Court disagreed, holding that the requisite "crime of violence" was a conduct element of the offense even though that element was "embedded in a prepositional phrase[.]" *Id.* at 280. But that does not mean that every element

"not expressed in verbs," Maj. Op. at 10, is a conduct element. And here the Supreme Court has specifically told us that "the anterior criminal conduct that yielded the funds allegedly laundered" is not a conduct element of concealment money-laundering. *Cabrales*, 524 U.S. at 7.

Nor does *Cabrales* itself support the result here. True, the Court did observe that "[m]oney laundering . . . arguably might rank as a continuing offense triable in more than one place, if the launderer acquired the funds in one district and transported them into another." *Id.* at 8. The idea that the mere transportation of unlawful proceeds out of a particular district is enough to support venue in that district for *concealment* money-laundering, however, is irreconcilable with the Court's statement that the conduct giving rise to that offense is "only the financial transactions[.]" *Id.* at 7. What the Court likely had in mind, rather, was the closely related offense of *transportation* money-laundering, for which "transport[ing]" the funds is indisputably a conduct element, *see* 18 U.S.C. § 1956(a)(2)(B)(i), and which is therefore indeed a continuing offense "if the launderer acquired the funds in one district and transported them into another." *Cabrales*, 524 U.S. at 8; *see also Cuellar v. United States*, 553 U.S. 550, 557-60 (2008). But here Myers was charged with concealment money-laundering, for which the conduct element is "conduct[ing] . . . a financial transaction[,]" 18 U.S.C. § 1956(a)(1)(B)(i), rather than "transport[ing]" the funds, *id.* § 1956(a)(2)(B)(i).

In *Cabrales*, the Court also observed that the "the counts at issue do not charge Cabrales with conspiracy." 524 U.S. at 7. Here, of course, Myers was charged with conspiracy. But conspiracy to commit money-laundering is a different offense than concealment money-laundering. *See* 18 U.S.C. § 1956(h). And an agreement to launder is a conduct element of conspiring to money-launder, whereas for concealment money-laundering an agreement is not a conduct element. *See Cabrales*, 524 U.S. at 7; *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016). Here, I agree that venue was proper in the Western District of Michigan for the conspiracy charge, because the conspiracy (*i.e.*, the relevant agreement) was obviously in place while Myers was in that district. But that agreement cannot support venue in that district on the concealment money-laundering charge, because again the agreement was not a conduct element of that offense.

The Constitution requires us to determine venue crime-by-crime, rather than in gross. I therefore respectfully dissent from the Majority's decision to affirm Myers's convictions on the concealment money-laundering charges (counts 6 and 7). And I otherwise concur in all but Part II of the Majority's thoughtful opinion.