RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee*,

*v.*

BRYAN BAILEY (18-5607); CALVIN BAILEY (18-5901);
SANDRA BAILEY (18-5903),

> *Defendants-Appellants*.

⎤
⎟
⎟
⎟
⎟
⎬ Nos. 18-5607/5901/5903
⎟
⎟
⎟
⎟
⎦

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:15-cr-10011—S. Thomas Anderson, District Judge.

Argued: January 29, 2020

Decided and Filed: September 1, 2020

Before: SILER, GIBBONS, and READLER, Circuit Judges.
_____

## COUNSEL

**ARGUED:** Charles H. Barnett, IV, SPRAGINS, BARNETT & COBB, PLC, Jackson, Tennessee, for Appellant in 18-5607. Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant in 18-5901. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 18-5903. Matthew Wilson, UNITED STATES ATTORNEY'S OFFICE, Jackson, Tennessee, for Appellee. **ON BRIEF:** Daniel J. Taylor, Jackson, Tennessee, for Appellant in 18-5607. Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant in 18-5901. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 18-5903. Matthew Wilson, UNITED STATES ATTORNEY'S OFFICE, Jackson, Tennessee, Naya Bedini, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   A jury convicted Sandra Bailey, Calvin Bailey, and their son Bryan Bailey of conspiring to commit healthcare fraud and other related crimes.[1]  The district court sentenced Sandra to 120 months' imprisonment, Calvin to forty-five months' imprisonment, and Bryan to eighty-four months' imprisonment.  Sandra, Calvin, and Bryan bring a number of challenges to their convictions, and Sandra and Calvin also challenge their sentences.  Most of those challenges lack merit.  We agree with Sandra, however, that the district court miscalculated her Guidelines-range sentence when it erroneously imposed a two-level increase in her offense level for using "mass marketing" in her scheme.  We also agree with Calvin that the district court incorrectly calculated the loss amount for which he was responsible—and by extension, his Guidelines-range sentence—by holding him responsible for losses beyond those he agreed to jointly undertake.  Accordingly, we affirm the convictions of Sandra, Calvin, and Bryan.  We vacate Sandra's and Calvin's sentences, however, and remand to the district court for resentencing.

I.

Medicare and Medicaid, two federally funded healthcare benefit programs, cover eighty percent of the cost of power wheelchairs and back braces when the devices are medically necessary.  A wheelchair is medically necessary when the patient is unable to perform activities of daily life even with the aid of a cane, walker, manual wheelchair, or scooter.  Wheelchairs must be prescribed by a medical professional who has performed a face-to-face examination of the patient.

A.

In fall 2009, Sandra, Calvin, and Bryan Bailey began working for Jaspan Medical Systems, a company that sold durable medical equipment ("DME") like back braces, knee

---

[1]To avoid confusion, this opinion refers to the defendants by their first names.

braces, and power wheelchairs in western Tennessee. Sandra was Jaspan's primary sales representative and received a $750 commission for each sale of a power wheelchair. Calvin was also listed as a sales representative, but he was rarely seen by other Jaspan employees. Bryan was initially hired as an office manager but was soon asked to run the company—including overseeing, among other things, personnel decisions, the awarding of sales commissions, and compliance with Medicare rules and regulations.

Sandra achieved impressive sales numbers by convincing individuals insured by Medicare to purchase a power wheelchair for which they had no need. Among those to whom Sandra sold power wheelchairs were individuals who could walk and drive, individuals who could not use the power wheelchair as intended, and individuals who had contacted Jaspan to purchase different assistive devices. Sandra even sold power wheelchairs to a couple so unburdened by mobility issues that they operated a daycare. These power wheelchairs largely went unused.

Sandra often lied to close these sales. In 2009, she told one prospective customer that "in 2010 . . . Medicare would not be able to buy [power wheelchairs]." DE 314, Trial Tr., Page ID 2239. And she told another couple that they needed to order the power wheelchairs then— despite having no need for them—because they might need them later in life and that, if then-President Barack Obama was reelected, power wheelchairs would no longer be available through Medicare.

To find additional customers for power wheelchairs, Sandra paid previous customers to provide her lists of names of individuals to contact to sell power wheelchairs or to arrange a gathering of individuals where Sandra could sell power wheelchairs in person. Sandra paid these referrers through cash, gift cards, and other gifts like dresses or turkeys.

Sandra coached referrers on how to identify patients insured by Medicare. She also suggested that they gather ten to twelve individuals before having her attend a gathering. And she instructed them not to tell others that she was paying them for their referrals. She specifically told one referrer that she was being investigated by the FBI and that, should the FBI

speak with the referrer, the referrer should not tell the agency anything, including anything about the money Sandra paid the referrer.

Through these referrers, Sandra developed a network of contacts throughout western Tennessee, including contacts in Trezevant, Humboldt, Martin, Atwood, and Henning, Tennessee. One referrer alone gave Sandra eighty-four names of individuals to whom Sandra could sell power wheelchairs.

Meanwhile, Sandra relied on Cindy Mallard, an assistant to Nurse Practitioner Mechelle Perry, to help circumvent the medical necessity requirement. Sandra asked Perry to prescribe DMEs to patients discharged from a local hospital and told Perry that she was allowed to prescribe DMEs without a face-to-face visit. Mallard assured Perry that Sandra's claim that Perry could prescribe DMEs without face-to-face visits was true.

Perry agreed to prescribe DMEs based on the paperwork alone, but, because she was not performing face-to-face evaluations, would not complete the "review of systems" section. Yet, this section was completed for many patients for whom Perry prescribed power wheelchairs. And many of the customers for whom Perry is listed as the prescriber do not recall meeting her. Perry testified that she recognized Mallard's handwriting in the review of systems portion of the form. While Mallard was employed by Perry, Sandra withdrew over $9,000 in cash on dates close to, and in increments matching or similar to, deposits made by Mallard.

Calvin was also on the Jaspan payroll and received sales commissions, but he was rarely seen in the office. Some customers whose paperwork stated that Calvin had sold them a power wheelchair reported that they never met Calvin, only Sandra. Bryan testified that Calvin assisted at Jaspan through "people contacting him as far as needing, family members needing chairs," and that "[Calvin] and [Sandra] worked together doing power wheelchairs." DE 322, Trial Tr., Page ID 3678–79.

While Sandra and Calvin were out selling power wheelchairs, Bryan was running Jaspan. Lisa Vega, a Jaspan employee, testified that Bryan reviewed all paperwork related to power wheelchairs as part of his duty to ensure Medicare compliance. Vega testified that, when she identified paperwork missing patient or physician signatures for Bryan, he often turned around

completed paperwork in a short time, sometimes a matter of minutes, despite the absence of the signing physicians. Vega further testified that she witnessed Bryan forging paperwork for a wheelchair order. Vega also witnessed Bryan shred a portion of a patient's file that was unfavorable to a Medicare claim for a power wheelchair. And Vega testified that she was asked to falsify information on the co-payment form to ensure patients did not have to pay the twenty percent costs not covered by Medicare. Bryan signed the forms containing customers' financial and insurance information, but many customers testified that they never provided Bryan with such information or even spoke with him.

Because he was tasked with running Jaspan, Bryan oversaw his parents' work. He certified that Sandra and Calvin had received Medicare compliance training. When Vega raised her suspicions about prescriptions for power wheelchairs from Perry, she noticed that her responsibilities in the office decreased. And when a doctor's office accused Sandra of forgery, Bryan instructed Jaspan employees not to talk to the office's manager. Finally, Bryan occasionally assisted Sandra with visits to customers and received some of Sandra's commissions.

In 2011, Sandra and Calvin left Jaspan for other DME suppliers. DuraTech Medical ("DuraTech") hired Sandra as a subcontractor. Calvin was hired both by Apple Independence Mobility ("Apple") and Orthopaedic Specialties of Lexington, Inc. ("Orthopaedic Specialties"). Neither Apple nor Orthopaedic Specialties was aware that Calvin remained employed as a middle-school principal. Bryan remained Jaspan's office manager. Despite working at different companies, the Baileys' scheme was largely unchanged.

Sandra returned to many of her power wheelchair customers when she began selling back braces for DuraTech. For example, in 2012, Sandra returned to the residence of a former power wheelchair customer to sell him and his parents back braces, even though none of the three needed a back brace or were examined by a doctor before receiving one. Sandra also used previous customers as referrers for back brace customers. One former customer testified that she, at Sandra's request, gathered several people at her house to meet with Sandra and that Sandra gave those gathered back braces. That same customer testified that Sandra said that

"she wanted to compensate [her]" and gave her a bag containing $200.  DE 318, Trial Tr., Page ID 2593–95.

At DuraTech, Sandra relied on Dr. Matthew Presson to prescribe back braces to individuals he did not evaluate face-to-face.  Presson testified that he did house calls on Saturdays with Sandra where he physically examined patients before prescribing power wheelchairs and back braces.  Presson's name appears on the paperwork for all the individuals to whom Sandra sold back braces, but many of those individuals testified that they had "[n]ever heard of" Presson.  DE 320, Trial Tr., Page ID 3013.  Presson testified that Sandra occasionally bought dinner for him and his parents at the end of his Saturday house calls with Sandra.  But Presson previously told agents investigating the Baileys that Sandra paid him between $200 and $300 every Saturday.

Sandra was also involved in her husband's work for two other companies, Apple and Orthopaedic Specialties.  Sandra recommended Calvin to Apple's owner, explaining that Calvin could "get a lot of business that they had from their previous company as far as referral sources." DE 320, Trial Tr., Page ID 3180.  Once, Calvin drove potential DME customers to a local motel where Sandra helped each customer fill out paperwork for DMEs; Calvin billed a room in that motel to Apple.  One of Sandra's referrers testified that Calvin paid him for helping gather the individuals who came to the motel.  Meanwhile, Apple's owner became concerned with how frequently Calvin's DME paperwork was incomplete or listed Presson as the prescribing doctor. That prompted Sandra to call employees at Apple instructing them not to call the doctors prescribing the power wheelchairs Calvin was selling.

Back at Jaspan, Bryan hired Dennis Sensing to be a sales representative in northern Mississippi.  Sensing sent Bryan paperwork relating to power wheelchair sales to review.  Bryan returned the paperwork with comments explaining how Sensing could change patient information on the paperwork to ensure Medicare reimbursed the power wheelchair.  Sensing forged signatures on the paperwork and informed Bryan of the forgeries.  Once, when Sensing lamented that his forgery skills were poor, Bryan replied, "[D]on't worry about it.  I've been taking care of momma for a long time.  I'll take care of yours."  DE 319, Trial Tr., Page ID 2968.

Like Sandra, Bryan had Presson prescribe power wheelchairs to customers who Presson had not physically examined.

In January 2013, Jaspan was reported to the Medicare fraud hotline. That same month, Ronnie Winbush, one of Sandra's paid referrers, became an informant for a government investigation into the Baileys led by Agent Richard Haines from the Department of Health and Human Services and Agent Clayton Goldsmith of the Federal Bureau of Investigation. Winbush made numerous recordings of phone calls between himself, Sandra, and other members of the conspiracy. In one conversation, another referrer told Winbush that "[Sandra] and Bryan paid me real good" and offered to connect Winbush with Sandra and Bryan. DE 217-3, Gov. Resp. to Mot., Page ID 878–79. In another recorded conversation, Sandra told Winbush not to tell others about the money she gave him because "it could get [her] into trouble." 18-5607 CA6 R. 44, Appellee App., CD Ex. 49 (1:11:00 to 1:11:54). And in a later recorded conversation, Sandra revealed to Winbush that she was under investigation and that the money she paid him was for his driver's license.

## B.

A grand jury indicted Sandra, Calvin, and Bryan Bailey, as well as Cindy Mallard, on one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371. Sandra was also charged with seven counts of health care fraud, in violation of 18 U.S.C. § 1347, and nine counts of illegal remuneration involving health care fraud, in violation of 42 U.S.C. § 1320a-7b(b)(2)(a). Bryan was also charged with one count of wire fraud, in violation of 18 U.S.C. § 1343. Before trial, Cindy Mallard pled guilty to a charge in a separate case and in return the government dismissed her as a defendant in this case. The government also dismissed two of the counts of health care fraud against Sandra.

The Baileys' joint trial commenced on October 30, 2017. However, the case was continued mid-way through trial in November after Sandra's psychiatric condition deteriorated. The trial resumed in front of the same jury on February 12, 2018.

The jury convicted Sandra, Calvin, and Bryan on all counts.  The district court sentenced Bryan to eighty-four months' imprisonment and ordered him to pay restitution in the amount of $1,951,080.01.

Calvin was sentenced to forty-five months imprisonment.  The district court increased Calvin's offense level by sixteen levels after finding that he was responsible for an amount of loss greater than $1,500,00.00.

Sandra was sentenced to 120 months imprisonment.  Sandra received three sentencing enhancements relevant to her appeal: (1) a four-level enhancement for being a leader of criminal activity; (2) a two-level enhancement for mass marketing; and (3) a two-level enhancement for obstruction of justice.  Sandra and Calvin were ordered to jointly pay $1,391,649.80 in restitution.  The district court later reduced that amount by $12,430.68 with the parties' consent.

All three defendants timely appealed.

## II.

We begin with Bryan's assertion that the district court erred by admitting into evidence recordings of statements made by Winbush and Wanda Wiggins, a woman who received an unneeded power wheelchair from Sandra and whom Sandra later paid in exchange for referrals. The district court concluded that the statements were not hearsay because they were made by Bryan's co-conspirators in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  Bryan contends that was an error because the government failed to demonstrate by a preponderance of the evidence that Bryan was a member of the conspiracy and because Wiggins's and Winbush's statements were not made in furtherance of the conspiracy.  We review the district court's legal conclusions *de novo* and its factual conclusions for clear error.  *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011).  "Where the admissibility is a close call, the trial judge's findings should generally remain undisturbed."  *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994).

While out-of-court statements of another are generally not admitted as evidence of the truth of the matter asserted, the Federal Rules of Evidence exclude statements made by a

defendant's co-conspirator from this rule.  Fed. R. Evid. 801(d)(2)(E).  To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made in furtherance of the conspiracy.  *United States v. Adams*, 655 F. App'x 312, 319 (6th Cir. 2016) (citing *Kelsor*, 665 F.3d at 693).  Bryan challenges the government's proof on the latter two factors.  The government established both.

Before co-conspirator statements can be entered into evidence, "a defendant's participation in the conspiracy must be established . . . by a preponderance of the evidence." *United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007) (quoting *Clark*, 18 F.3d at 1341). While the government may introduce the out-of-court statements as evidence of the defendant's participation in the conspiracy, *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), those statements must be supported by independent evidence that is strong enough "to rebut and overcome the presumed unreliability of" out-of-court statements, *Conrad*, 507 F.3d at 429 (quoting *Clark*, 18 F.3d at 1341).

Here, the out-of-court statements are evidence of Bryan's participation in the conspiracy, and independent evidence rebuts the presumption of unreliability.  The recordings of Wiggins and Winbush demonstrate that Bryan joined Sandra in paying kickbacks to those who referred customers for durable medical equipment:

| | |
|---|---|
| Winbush: | When you worked with Ms. Bailey did you hook her up with a lot of wheelchair customers? |
| Wiggins: | Uh huh, yeah. |
| Winbush: | You did? |
| Wiggins: | Um hmm. |
| Winbush: | She just, she just, she just pay you pretty good? |
| Wiggins: | Yeah, she pay you pretty good. |
| Winbush: | Talking about when you, when you was helping her out. |
| Wiggins: | Yeah, she paid me pretty good.  She *and Bryan* paid me real good. |

DE 217-3, Gov. Resp. to Mot., Page ID 878–79 (emphasis added).  Independent evidence

corroborates Bryan's role in the conspiracy. One customer testified that she did not know Bryan or provide him with her financial information, yet Bryan's named appeared on a financial statement for that customer. Vega, Bryan's employee, testified that Bryan reviewed all the paperwork submitted by Jaspan's sale representatives for DMEs; that both Sandra and Calvin were sales representatives for Jaspan and that paperwork lacking patient or doctor signatures often came from Sandra; and that she witnessed Bryan forge patient signatures and noticed that Bryan obtained doctor's signatures within five minutes of her notifying him that the signatures were missing, even though she never saw those physicians in the Jaspan offices.

Nor, given the deference owed to the district court's decision, can we disturb its conclusion that the government also sufficiently proved that the statements were in furtherance of the conspiracy. We look to the speaker's intent when determining whether statements are made in furtherance of a conspiracy. *See United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003). Still, "[a] statement may be in furtherance of a conspiracy 'even if not exclusively, or even primarily, made to further the conspiracy.'" *United States v. Henderson*, 307 F. App'x 970, 977 (6th Cir. 2009) (quoting *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000)). "[S]tatements identifying other conspirators and their roles in the conspiracy" further the conspiracy. *United States v. Jordan*, 511 F. App'x 554, 562 (6th Cir. 2013) (quoting *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989)).

A permissible reading of Wiggins's conversation with Winbush is that she intended to encourage and assist Winbush in participating in the conspiracy. Wiggins consistently spoke of Winbush's potential participation. DE 217-3, Gov. Resp. to Mot., Page ID 881 ("Winbush: Ms. Bailey . . . get you a chair and you don't even need one[?] Wiggins: Yeah. You know, you tell her you need [a power wheelchair] and uh you explain to her why you need it or why you think you need it and . . . she'll hook you up . . . ."); *id.* at 883 ("[J]ust think if . . . [Sandra] get[s] 500 dollars per wheel chair, then *you get her 10 people today* and then I get her 10 people . . . ." (emphasis added)). Wiggins aided Winbush's participation by identifying Presson, Bryan, Calvin, and Sandra as members of the conspiracy. And Wiggins described Sandra, Calvin, and Bryan's role in the conspiracy, explaining that "[Sandra] and Bryan paid me real good" for

referring wheelchair customers, *id.* at 879, and that Calvin "don't sell, he go with [Sandra] sometimes when he's off," *id.* at 882.

Bryan disagrees, insisting that, in light of Wiggins declaring that she "stopped [working with Sandra] all together [sic] . . . after [she] got sick," *id.* at 878, our decision in *Darwich* precluded the district court from considering Wiggins's conversation to be in furtherance of the conspiracy. This argument fails for a number of reasons. First, it misreads *Darwich*. *Darwich* did not say that conversations about past events could not be made in furtherance of a conspiracy, it said that "mere 'idle chatter or casual conversation about past events'" could not be made in furtherance of a conspiracy. 337 F.3d at 657 (quoting *Tocco*, 200 F.3d at 419.) *Darwich* distinguished the impermissibly admitted statements from "[s]tatements that identify participants and their roles in the conspiracy." *Id.* (alteration in original) (quoting *United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997)). Second, Bryan conceded at oral argument that Wiggins had not formally withdrawn from the conspiracy. And the conspiracy extended beyond the time of Wiggins's conversation with Winbush.

Finally, to the extent Bryan contends that there must be some forward-looking statements regarding the conspiracy, Wiggins's conversation with Winbush included as much. Although Wiggins does indicate in the call that she at some point stopped working for Sandra, her remarks can be fairly characterized as encouraging Winbush's participation in the scheme. Moreover, at the outset of the conversation, Wiggins said she was going to call Sandra to get Bryan's number to see if Bryan could help her get a knee brace, reflecting ongoing participation in the conspiracy. Later, the following exchange occurred:

> Wiggins: I'm gonna try my best to get in touch with him today. I'm going to try to get in touch with Ms. Bailey today and tell Bryan to, you know, call me. I'm gonna ask him, ask him to do me a favor and when she tell me what it is, I'm gonna ask her to send Bryan by here so I can get me a knee brace.
>
> Winbush: Uh huh. Do you have to go to the doctor for a knee brace?
>
> (Talking over each other)
>
> Wiggins: Uh uh. I went over to Dr. Presson's about 3 weeks ago and I had missed Bryan by 2 minutes.

| | |
|---|---|
| Winbush: | Um. Ok. |
| Wiggins: | Missed him by 2 minutes. |
| Winbush: | What do knee braces cost? |
| Wiggins: | I don't know. Like I said, I don't know how much they cost. And uh… |
| Winbush: | Bryan can get you one without seeing the doctor? |
| Wiggins: | Dr. Presson told me to call Bryan and uh he said my knee was in bad shape. So, he, uh, if I call, if I catch up with Bryan, he'll come out here, Dr. Presson will sign the papers saying I need one. |

DE 217-3, Gov. Resp. to Mot., Page ID 885–86. This exchange involves two other members of the conspiracy, Presson and Bryan, and involves the object of the conspiracy, fraudulently obtaining DMEs. Bryan contends that Wiggins was discussing her legitimate need for a knee brace. But there is plenty of suspect content to the conversation. Wiggins says she "needs a favor" from Bryan. While she says she visited Presson earlier, she said she "had missed Bryan [at Presson's office] by 2 minutes." DE 217-3, Gov. Resp. to Mot., Page ID 886. It is not clear why Bryan would have been at Presson's office or why his being there would have helped Wiggins get a knee brace. We cannot say that the district court clearly erred in viewing the conversation as in furtherance of the conspiracy.

Because the government demonstrated that (1) there was a conspiracy, (2) Bryan was a member of the conspiracy based on evidence independent of Wiggins's out-of-court statements, and (3) Wiggins's out-of-court statements were made in furtherance of that conspiracy, the district court properly admitted the statements pursuant to Federal Rule of Evidence 801(d)(2)(E).

III.

Bryan next argues that the district court erred in permitting Haines to testify three times during trial. This issue arose from the trial's lengthy continuance. Haines testified before the break, immediately after the break, and then again just before the government rested its case. The defendants objected to the second recall of Haines, arguing that the government reserved only the right to recall Haines once, not twice. The government explained that it had always

planned to recall Haines at the end of trial but had to "unexpectedly" recall him earlier to impeach Presson's testimony—the last testimony the jury heard before the three-month continuance.  DE 321, Trial Tr., Page ID 3287.  The district court overruled the objection, explaining that, "because of the delay we have encountered, I don't see really how the defendants are going to be prejudiced." *Id.* at 3291.

Federal Rule of Evidence 611(a) gives the district court "reasonable control over the mode and order of examining witnesses and presenting evidence."  Because the matter is left to the "substantial discretion" of the district court, we reverse the district court only where its erroneous decision affected the defendant's substantial rights.  *United States v. Fields*, 763 F.3d 443, 465 (6th Cir. 2014) (quoting *United States v. Maddox*, 944 F.3d 1223, 1230 (6th Cir. 1991)).

A district court controls the mode and order of examining witnesses to "(1) make those procedures effective for determining truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a).  Of course, the district court must ensure that evidence presented at trial is relevant, Fed. R. Evid. 401, and that it is more probative than prejudicial, Fed. R. Evid. 403.  When a witness is brought back to testify "before the defendant has presented any evidence, it is unlikely that prejudice sufficient to establish an abuse of discretion can be established."  *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985).

Given the deference owed to the district court on this issue, and the unique circumstances surrounding this trial, we see no occasion to disturb the district court's judgment.  First, it is not obvious from the transcript that the government failed to give the defendants notice that it would recall Haines more than once if it needed to impeach witness testimony.  When the government called Haines, it explained its intent to recall Haines later in the trial "in summary fashion" *and* to recall him again "if there is an issue that is brought up."  DE 253, Trial Tr., Page ID 1134–35.  The government recalled Haines to impeach Presson's testimony.  Presson testified just before the continuance that he had not been paid by Sandra, but instead that she had merely bought him dinner.  When the trial resumed, the government recalled Haines who testified that Presson's testimony was false.

Second, the district court, better positioned than this court to determine the effect of allowing Haines to testify a third time, made a reasonable decision.  Haines testified a third time to provide summary testimony.  The district court allowed Haines to testify because of the abnormal "delay [the parties] have encountered," because the court did not "see really how the defendants are going to be prejudiced," and because Haines's testimony "was relevant, admissible, and not unduly prejudicial."  DE 321, Trial Tr., Page ID 3290–91; DE 336, Order, Page ID 4029.  The district court's statements make clear that it considered its role in managing the trial and avoiding prejudice to the defendants.  And the defendants had not yet presented any evidence when Haines was recalled.  *See Blankenship*, 775 F.2d at 741.

Bryan notes several decisions providing that a district court may "curtail or entirely preclude questioning as to any matter of questionable relevance."  18-5607 CA6 R. 33, Appellant Br., at 34 (quoting *United States v. Ferguson*, 252 F. App'x 714, 723 (6th Cir. 2007)).  Those decisions accomplish little.  District courts have wide latitude over the order of testimony at trial.  Bryan does not point to any decision holding that a district court abused this significant discretion by allowing a witness to testify a third time under circumstances similar to the Baileys' trial.

IV.

All three defendants argue that the government failed to present sufficient evidence for a rational juror to find the elements of each count beyond a reasonable doubt.

Defendants "bear[] a very heavy burden" when challenging the sufficiency of the evidence supporting a jury verdict.  *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)).  A conviction will be upheld where the evidence, "viewed in the light most favorable to the government," supports the jury's verdict.  *United States v. Chaney*, 921 F.3d 572, 589 (6th Cir. 2019) (quoting *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003)).  "[C]ircumstantial evidence alone can defeat a sufficiency challenge."  *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015).  We are especially hesitant to disturb a jury verdict when the district court "thoroughly considered and subsequently denied" a motion of acquittal.  *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir.

2011) (quoting *United States v. Lee*, 359 F.3d 412, 418–19 (6th Cir. 2004)).  "[W]e may not reweigh [the evidence] 'or substitute our judgment for that of the jury.'"  *United States v. Smith-Kilpatrick*, 942 F.3d 734, 745 (6th Cir. 2019) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

A.

A defendant commits health care fraud when she "knowingly and willfully executes . . . a scheme or artifice to defraud any health care benefit program," or uses "false or fraudulent pretenses, representations, or promises," to obtain money or property of a health benefit program.  18 U.S.C. § 1347(a).  To prove conspiracy to commit health care fraud, "the government must establish: (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy."  *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).  Direct evidence of intent to commit fraud is not necessary—circumstantial evidence from which a jury could draw reasonable inferences of intent to commit fraud will suffice.  *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013).  "[O]nce the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight."  *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019) (second alteration in original) (quoting *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006)).

The evidence of the Baileys' agreement to defraud Medicare is voluminous and indicates that the Baileys agreed to enrich themselves by artificially increasing their sales of DMEs—and the sales commissions they received—by selling power wheelchairs to individuals insured by Medicare who did not qualify for power wheelchairs.

There is also ample evidence to link each of the Baileys to the conspiracy.  Sandra sold power wheelchairs to individuals who did not have mobility issues by falsely telling those individuals that the power wheelchair would be free and that they might not have an opportunity to obtain one later.  And Sandra circumvented the requirement that the equipment be deemed medically necessary by telling Perry that Perry did not need to evaluate patients in person to prescribe a power wheelchair.  Sandra paid Mallard to confirm her lie to Perry and to forge

portions of Perry's paperwork.  For Sandra's sales, Bryan forged co-insurance forms to ensure that the power wheelchair was free for the customers.  And Bryan sometimes accompanied Sandra on trips to make sales.  Calvin also accompanied Sandra on trips to make sales, and Calvin received commissions for some sales, even though he did not make the sale himself.

The evidence also reflects a number of overt acts in furtherance of the conspiracy, including:  testimony from several individuals that Sandra paid them in exchange for referrals; Vega's testimony that she witnessed Bryan forge paperwork related to a power wheelchair order; and Calvin's billing to Apple a motel room he and Sandra used to sell power wheelchairs for DuraTech.

Bryan argues that without admission of the call between Wiggins and Winbush the government lacks sufficient evidence to show that he agreed to participate in the scheme. Because the statements were properly admitted, that argument lacks merit.  But, even without Wiggins's statements, ample evidence supports Bryan's conviction.  Jaspan employees witnessed Bryan forging paperwork associated with purchasing power wheelchairs.  At least one customer testified that Bryan pushed a power wheelchair on her after she repeatedly told him that she did not want it.  And Sensing testified that Bryan told him he forged paperwork relating to Sandra's sales.

Calvin argues that the government never proved that he "submitt[ed] false claims or that he agreed to pay kickbacks to get referrals for healthcare benefits."  18-5901 CA6 R. 41, Appellant Br., at 19.  But one referrer testified that Calvin paid him a kickback.  And Calvin accepted sales commissions for sales of power wheelchairs to individuals he never met.  A jury could reasonably conclude that Calvin's acceptance of those commissions amounted to knowledge of and intent to join the conspiracy.

Sandra argues that "[t]he Government never proved with whom [Sandra] agreed to commit healthcare fraud or to promote an illegal kickback scheme."  18-5903 CA6 R. 32, Appellant Br., at 37.  The record is simply to the contrary.  Sufficient evidence supported Sandra's, Calvin's, and Bryan's convictions for conspiracy to commit healthcare fraud.

B.

Next, Sandra challenges the sufficiency of the evidence for her conviction on five counts of health care fraud, one count each for her transactions with individual DME customers, one of whom is Winbush.

There was ample evidence of Sandra's use of false pretenses or representations to artificially increase her sales of DMEs and therefore increase her sales commissions. Three individuals testified that Sandra sold them power wheelchairs that they did not need and rarely used. Each individual's paperwork stated that Perry prescribed their wheelchair, but Perry did not examine any of the patients in person. Perry believed that she could prescribe wheelchairs to individuals that she had not examined in person because Sandra told her so—a lie Sandra paid Mallard to confirm to Perry. Winbush testified that Sandra purchased him a cane to give the false impression that he struggled walking. Another customer testified that Sandra sold him and his wife power wheelchairs that they did not need by falsely telling them that, if then-President Obama was re-elected, they would be unable to buy power wheelchairs. A jury could reasonably infer from the evidence of Sandra's false pretenses that she intended to defraud Medicare for her own financial gain.

Sandra's attempts to avoid this conclusion fail. She argues that "it is undisputed that each of the patients that received wheelchairs signed their own paperwork indicating the information therein was true." 18-5903 CA6 R. 32, Appellant Br., at 32. But evidence at trial demonstrated that Bryan was falsifying co-insurance information on the paperwork after patients had signed. Sandra also argues that ensuring Medicare compliance was someone else's job. But Sandra visited many of the patients to whom she sold power wheelchairs and should have noticed that they did not struggle with mobility. For example, one customer testified that he was taking care of the children at the daycare he and his wife ran when Sandra visited to sell them power wheelchairs. And Sandra distributed back braces to individuals gathered at another customer's home knowing that none had seen a doctor to be prescribed a back brace. Finally, there is voluminous evidence of Sandra's calculated efforts to circumvent the rules governing the benefits program. Sufficient evidence supported each of Sandra's convictions for health care fraud.

C.

Sandra also challenges her convictions for nine counts of illegal remuneration involving health care fraud.  It is a crime to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2)(A).  Sandra's nine counts represent charges for payments to eight individuals; two charges are for payments to Winbush.  All but one individual testified at trial that Sandra paid them.  Winbush testified at trial that Sandra gave that individual an envelope full of money after she brought Sandra wheelchair patients.  A jury could reasonably infer that Sandra made these payments to induce the individuals to refer customers to Sandra.  Sufficient evidence supports each of Sandra's convictions for illegal remuneration involving health care fraud.

D.

Finally, Bryan challenges his conviction for wire fraud.  A defendant commits wire fraud when he (1) knowingly and willfully, (2) participates in a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, and (3) uses interstate wire communications to further that scheme.  18 U.S.C. § 1343.

Ample evidence supports Bryan's conviction for wire fraud.  Sensing testified that he and Bryan participated in a scheme to defraud Medicare by selling power wheelchairs to individuals for whom the device was not necessary.  Sensing further testified that he faxed paperwork to Bryan containing forgeries and that Bryan was aware that the documents contained forgeries.  And Sensing testified that Bryan faxed him back documents with instructions on how to best further falsify the paperwork.

V.

In yet another alleged error related to the lengthy continuance, all three defendants contend that the district court abused its discretion in allowing the government to play an edited

audio recording during its case-in-chief.  The eight-minute tape combined portions of various recorded phone calls between the defendants and co-conspirators that had already been entered into evidence in their entirety.  Some of the phone calls had already been played for the jury before the break.  We review the district court's decision to permit the government to play the tape for abuse of discretion.  *United States v. Harris*, 881 F.3d 945, 950 (6th Cir. 2018).  The district court abuses it discretion when it relies on a clear error of fact or improperly interprets or applies the law.  *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).  Even where a district court errs, we will order a new trial only if the error affected the defendants' substantial rights or materially affected the verdict.  *Id.*  While the district court technically erred in failing to provide a limiting instruction to the jury before allowing the government to play the tape, the error was harmless.

The Federal Rules of Evidence allow a party to introduce "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," so long as the proponent makes the originals or duplicates available for examination and can, if called upon, produce them in court.  Fed. R. Evid. 1006.  A party seeking the admission of a summary under Rule 1006 must demonstrate, *inter alia*, that the recordings are "so 'voluminous' that they 'cannot conveniently be examined in court' by the trier of fact" and that the summary is accurate and nonprejudicial.  *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (quoting *United States v. Seelig*, 622 F.2d 207, 214 (6th Cir. 1980)).

"[T]he summary should be accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not constitute evidence."  *United States v. Vasilakos*, 508 F.3d 401, 412 (6th Cir. 2007).  Because summary evidence poses risks that "[t]he jury might rely upon the alleged facts in the summary as if these facts had already been proved," that the jury will use the summary "as a substitute for assessing the credibility of witnesses," or that the summary might "emphasiz[e] too much certain portions of the Government's case,"  district courts are to provide juries a limiting instruction *whenever* summary evidence is presented.  *United States v. Scales*, 594 F.2d 558, 564 (6th Cir. 1979).

The defendants first argue that the tapes were not properly admitted because the government did not show that the full tapes were so voluminous that they could not be played.**²** "There is no requirement in Rule 1006, however, that it be literally impossible to examine the underlying records before a summary or chart may be utilized." *Scales*, 594 F.2d at 562. And other circuits have permitted use of a summary tape under Rule 1006 where there were twelve hours of tapes. *United States v. Anderson*, 105 F.3d 670, at *2 (10th Cir. 1996) (unpublished table decision).

Here, there were about two hours of phone call recordings and seven hours of video recordings. Haines testified that there were multiple hours of recordings and that the content of the recordings was voluminous. Based on that record, we cannot conclude that the district court's factual finding that the records were voluminous was clearly erroneous. And we have previously rejected the defendants' argument that, because the jury had already heard some of the recordings in the summary tape, the recordings cannot be voluminous. *See Scales*, 594 F.2d at 562.

The defendants next argue that the summary tape was prejudicial, especially since the district court offered no limiting instruction. The government counters that a limiting instruction was not necessary because the summary tape included snippets of recordings already in evidence and therefore the traditional risks of prejudice from summary testimony were not present. That is not entirely correct. While the summary tape included recordings of calls already in evidence, Haines's testimony that the calls fell into four categories provided additional characterization of the calls. For example, one category was "calls about whether or not Sandra Bailey actually knew what she was doing was wrong." DE 321, Trial Tr., Page ID 3380. There was a risk the jury would treat Haines's characterizations as evidence. And Haines's characterizations did serve to "emphasiz[e]" some of the government's main contentions. *Scales*, 594 F.2d at 564. A jury instruction would have helped ameliorate the risk of prejudice to the Baileys.

---

**²**Sandra also argues that the government did not prove that each of the underlying tapes was admissible or that Haines supervised the production of the tape. Neither argument has merit. As to admissibility, the defendants' chief issue with the summary tape is that most of the tape's content was already played during trial and all of the underlying tapes were entered into evidence. As to Haines's supervision of the tape's creation, Haines testified that he supervised the creation of the tape.

Moreover, the government's argument about how much the summary tape risked prejudice to the defendants goes to whether the failure to provide a limiting instruction was harmful error, not whether the district court erred in failing to provide one. *Scales* requires district courts to provide juries a limiting instruction whenever summary evidence is presented. *Id.* The government presents no case law to the contrary. The district court thus erred when it permitted the use of summary evidence without a limiting instruction.

That error, however, was harmless. We need only vacate the Baileys' convictions if we lack "fair assurance that the outcome of [their] trial was not affected by evidentiary error." *United States v. Rayborn*, 491 F.3d 513, 518 (6th Cir. 2007). Here, we have plenty of assurances. First, the risk of prejudice from this summary tape was not so great as to constitute harmful error. The recordings on the summary tape were themselves already in evidence. While the failure to instruct the jury that the summaries were not themselves evidence did increase the risk that the jury would treat Haines's characterization of the tape's contents as conclusive, defendants had an opportunity to cross examine Haines. *See Kilpatrick*, 798 F.3d at 383 (suggesting that the risk of prejudice is reduced where defendants are "free to challenge the accuracy of any summary testimony through cross-examination"). Indeed, Sandra's attorney cross examined Haines extensively about how and why he decided to include certain snippets in the summary tape. Defendants argue that the summary tape was prejudicial because it lacked context. But, on cross examination, Sandra's counsel asked Haines if he recalled recordings that were beneficial to Sandra but not included in the summary tape. Finally, there is ample evidence of each defendant's guilt aside from the summary tape. "Given the overwhelming evidence of the defendants' guilt, we are satisfied that the court's failure to instruct on summary testimony did not affect the outcome of the trial." *Vasilakos*, 508 F.3d at 412.

## VI.

Calvin and Sandra argue that their trial was marred by a variance—a difference between the charges in the indictment and the proof offered during trial. *See United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). According to Calvin and Sandra, the government proved two conspiracies at trial instead of the one alleged: one between them, Perry, and Presson in Tennessee, and another between Bryan, Dennis Sensing, and Brenda Sensing in Mississippi.

Calvin and Sandra agree that, because neither raised the issue before the district court, we review for plain error. Thus, Calvin and Sandra must show that there was "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Perez-Martinez*, 746 F. App'x 468, 472 (6th Cir. 2018) (quoting *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998)).

Calvin and Sandra bear the burden of proving that a variance occurred. *Kuehne*, 547 F.3d at 683. "Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury [and is] to be considered on appeal in the light most favorable to the government." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003) (quoting *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988)). Accordingly, we will find a variance in a conspiracy case only where "the evidence can reasonably be construed only as supporting a finding of multiple conspiracies." *Id.* (quoting *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982)). "The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *Id.* "To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Id.* at 653. "Once the existence of a . . . conspiracy, as charged, has been shown, proof of a formal agreement is unnecessary." *United States v. Rugiero*, 20 F.3d 1387, 1391 (6th Cir. 1994). And, "[a] defendant may be convicted for a single conspiracy if the evidence supports a finding that he had knowledge or foresight of the conspiracy's multiplicity of objectives even where the 'conspiracy is open-ended . . . and the specifics of the future crimes . . . is undetermined or at least unknown to the defendant.'" *Smith*, 320 F.3d at 653 (quoting *United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir. 1994)).

Calvin and Sandra argue that the government's evidence concerning Jaspan's selling of power wheelchairs in Northern Mississippi from 2010 through 2013 was proof of a second conspiracy that "had nothing to do with" them. 18-5901 CA6 R. 41, Appellant Br., at 23. We disagree. While Calvin and Sandra's characterization of the evidence is a permissible one, it is not the *only* one. *See Smith*, 320 F.3d at 652. Reviewed for plain error or otherwise, that is not enough to reverse their convictions. *See United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.

1999) (explaining that the evidence "need not remove every reasonable hypothesis except that of guilt" (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986))).

Bryan's expansion of Jaspan into northern Mississippi, which occurred before Sandra and Calvin left Jaspan, was consistent with the Baileys' common goal of enriching themselves by increasing their sales of—and therefore sales commissions for—power wheelchairs to individuals insured by Medicare who did not qualify for power wheelchairs. *See Smith*, 320 F.3d at 652. Bryan received a $100 commission for every sale made by Dennis Sensing. The jury could have reasonably concluded that the expansion furthered the Baileys' common goal by providing the Baileys with new customers. The nature of the scheme also remained the same. The scheme used the same methods. Bryan, Sandra, and Calvin continued to sell DMEs to individuals insured by Medicare who did not qualify. Bryan told Sensing that he used the same forgery techniques that the two were deploying to sell power wheelchairs in Mississippi to "tak[e] care of momma." DE 319, Trial Tr., Page ID 2968. And, even after leaving Jaspan, Sandra relied on the referrers she had cultivated with Bryan at Jaspan to help her sell DMEs for DuraTech, Apple, and Orthopaedic Specialties. Members of the conspiracy also overlapped. *See Smith*, 320 F.3d at 652. Dennis Sensing was hired by Jaspan before Sandra and Calvin left. Bryan, Sandra, and Calvin relied on Presson to prescribe DMEs after Sandra and Calvin left Jaspan. And Wiggins told Winbush in 2013 that she could get in touch with Bryan through Sandra.

Calvin and Sandra's argument appears to rest on the fact that they were not employed by Jaspan for much of Sensing's criminal conduct. But we have previously held defendants responsible for a conspiracy where they did not participate in every portion of the conspiracy, particularly where participants overlapped and were "family who regularly associated with one another." *Smith*, 320 F.3d at 653. Moreover, "[w]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *United States v. Hamilton*, 689 F.2d 1262, 1268 (6th Cir. 1989) (quoting *United States v. Mayes*, 512 F.2d 637, 642–43 (6th Cir. 1975)). Here, Calvin and Sandra point to no evidence that they terminated their conspiracy

with Bryan.  Indeed, after Calvin and Sandra left Jaspan, they continued to use the same methods of defrauding Medicare as Bryan, used the same doctor to prescribe power wheelchairs to customers as Bryan, and remained in contact with Bryan about obtaining DMEs.  Sandra and Calvin's convictions are not undermined by a variance.

## VII.

Sandra argues that the district court erroneously imposed three sentencing enhancements resulting in a procedurally unreasonable sentence.  Specifically, she challenges the district court's imposition of enhancements for leadership, U.S.S.G. § 3B1.1(a), obstruction of justice, U.S.S.G. § 3C1.1, and mass marketing, U.S.S.G. § 2B1.1(b)(2).  Generally, when reviewing a district court's decision to apply a sentencing enhancement, we review the district court's factual findings for clear error and its legal conclusions *de novo*.  *United State v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009).  We agree with the district court's imposition of the leadership and obstruction of justice enhancements.  But, because the district court employed the wrong legal standard when imposing the mass marketing enhancement, we vacate Sandra's sentence.

## A.

The Sentencing Guidelines instruct a district court to increase a defendant's offense level by four if the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  We authorize an enhanced penalty based on the size of the criminal organization.  *United States v. Anthony*, 280 F.3d 694, 700 (6th Cir. 2002).  Specifically, "we consider 'whether the combination of knowing and countable non-participants is the functional equivalent of an activity carried out by five criminally responsible participants.'"  *United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017) (quoting *Anthony*, 280 F.3d at 699–701).  The enhancement may be appropriate when the defendant recruits accomplices to the crime and pays intermediaries for their work.  *United States v. Garcia*, 20 F.3d 670, 674 (6th Cir. 1994).  And we have upheld the imposition of the enhancement where a "scheme was quite extensive inasmuch as it involved the 'unknowing services of many outsiders.'"  *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015).

Here, the district court adopted the finding of the presentence report, which stated, in relevant part:

> Adjustment for Role in the Offense: The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a). During the conspiracy, the defendant was instrumental in organizing this conspiracy. She was able to utilize hundreds of patients due to directing numerous individuals in giving her patient referrals. She also obtained a sales position for Calvin Bailey, who had little if any sales experience, and she sold wheelchairs and back braces for him.

DE 369, Presentence Report, Page ID 4296. The district court agreed with that finding, explaining "[a]s is stated in the report, it does appear based upon the testimony that a large number of, the report says hundreds of patients. I believe the total number was above 600." DE 426, Sentencing Tr., Page ID 5407.

Sandra contends that the district court relied on an impermissible factor—the number of victims—in determining her role in the offense. That is incorrect. The district court appeared to be restating, albeit clumsily, the presentence report's rationale for the application of the enhancement. The presentence report's rationale does not rely on the number of victims; instead, it focuses on Sandra's "ab[ility] to utilize hundreds of patients due to *directing numerous individuals* in giving her patient referrals." DE 369, Presentence Report, Page ID 4296 (emphasis added). When the many referrers are counted alongside Mallard, Presson, Calvin, and Bryan, the operation was certainly equivalent to "an activity carried out by five criminally responsible participants." *Myers*, 854 F.3d at 358. That is an adequate basis for imposition of the leadership enhancement.

## B.

Sandra also argues that the district court erred in imposing a sentence enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. The precise standard of review for a district court's decision to impose the obstruction of justice enhancement is unclear. *See United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019). Some panels have reviewed the district court's determination that certain conduct constitutes obstruction *de novo*, while other panels

have reviewed the same question for clear error. *Id.* We need not settle the matter now because the district court's decision to impose the enhancement survives even *de novo* review.

The Sentencing Guidelines instruct district courts to impose a two-level increase to the defendant's offense level when a defendant has willfully obstructed the investigation of her offense and her obstructive conduct related to that offense. U.S.S.G. § 3C1.1. Application notes provide a non-exhaustive list of examples of the conduct to which the enhancement was intended to apply and not apply. *Id.* § 3C1.1 cmt. n.3. "[U]nlawfully influencing a . . . witness . . . or attempting to do so;" "suborning, or attempting to suborn perjury . . . if such perjury pertains to conduct that forms the basis of the offense of conviction;" and "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation" are examples of conduct to which the enhancement should apply. *Id.* § 3C1.1 cmt. n.4. Material statements are those that "if believed, would tend to influence or affect the issue under determination." *Id.* § 3C1.1 cmt. n.6. We recently clarified that material lies warrant a sentencing enhancement because they require that "[t]he United States devote[] time and resources to disprove them." *Thomas*, 933 F.3d at 611.

The district court identified two instances of obstructive conduct that justify the enhancement's application. Because at least one represents an attempt by Sandra to cause another to materially lie to investigators, we find no error in the district court's decision to impose the obstruction of justice enhancement.

Sandra attempted to cause Winbush to lie to investigators in a conversation on February 6, 2014. Sandra had previously told Winbush not to tell others about the money she gave him because "it could get [her] into trouble." 18-5607 CA6 R. 44, Appellee App., CD Ex. 49 (1:11:00 to 1:11:54). Then, on February 6, 2014, Sandra called Winbush and told him that she was under investigation and that the money she paid him was for his driver's license. The district court found that "it would be difficult for reasonable minds not to conclude that there was a[n] attempt by Ms. Bailey to obstruct justice, based on what she said to Ronnie Winbush." DE 426, Sentencing Tr., Page ID 5410. We agree.

Sandra's conduct rises to the level of obstruction. Sandra was charged with violating the anti-kickback statute, requiring the government to establish that she "knowingly and willfully offer[ed] or pa[id] any remuneration . . . to any person to induce such person to refer an individual . . . for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). Had Winbush told investigators that Sandra had only given him money to get a driver's license, investigators would have needed to "devote[] time and resources" to proving that Sandra actually gave Winbush the money for referrals. *Thomas*, 933 F.3d at 611.

Sandra's conduct is akin to the conduct in *United States v. Huntley*, 530 F. App'x 454 (6th Cir. 2013). There, Huntley, who was charged with possessing a firearm as a felon, asked two unidentified individuals to have another individual claim possession of the gun. *Id.* at 455–56. We held that his conduct rose to the level of obstruction because it represented "a substantial step toward [Huntley's] goal of" avoiding responsibility for his offense. *Id.* at 458. Similarly, Sandra's conduct was a substantial step toward avoiding responsibility for providing kickbacks in exchange for referrals in violation of the anti-kickback statute.

Sandra argues that her conversation with Winbush cannot constitute obstructive conduct because she was unaware that she was under investigation during the call. But Sandra stated that she was aware of the FBI investigation *during the call*. Besides, "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered . . . if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. n.1.

C.

Finally, Sandra argues the district court erred by imposing the mass-marketing sentence enhancement when she engaged only in word-of-mouth solicitation. U.S.S.G. § 2B1.1(b)(2)(A)(ii). Our circuit has yet to decide whether the mass-marketing enhancement can apply to word-of-mouth solicitation. We conclude it cannot.

The Sentencing Guidelines instruct district courts to increase the defendant's offense level by two if "the offense . . . was committed through mass-marketing." U.S.S.G.

§ 2B1.1(b)(2)(A)(ii).   The Guidelines' commentary further provides that "'mass-marketing' means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to [] purchase goods or services."   *Id.* § 2B1.1 cmt. n.4(A).   Other circuits have explained that the commentary's invocation of "telephone, mail, the Internet" suggests that the enhancement's application turned on the method the defendant used to market her goods, not the number of victims reached by way of the marketing.  *United States v. Heckel*, 570 F.3d 791, 794 (7th Cir. 2009); *see also United States v. Olshan*, 371 F.3d 1296, 1301 (11th Cir. 2004) ("[T]he [mass-marketing] enhancement focuses on the method of inflicting the harm.").   Specifically, other circuits look to "the scope and sophistication of the defendant's fraud."   *United States v. Fredette*, 315 F.3d 1235, 1244 n.4 (10th Cir. 2003).

We believe that this is the correct approach.  The emphasis on sophistication and scope is consistent with the text of the Sentencing Commission's commentary calling for a "plan, program, promotion, or campaign."  U.S.S.G. § 2B1.1 cmt. n.4(A).  And it makes sense.  Mass marketing cannot mean all marketing; rather, the enhancement must punish marketing designed to more efficiently (i.e., with "sophistication") defraud a large number of people (i.e., a sufficient "scope").  Fraudulent face-to-face marketing proceeds at the normal pace of fraud and is already accounted for in the statutes criminalizing fraud; no enhancement is necessary.

The government disagrees, arguing that the commentary's "other means" language encompasses word-of-mouth marketing.  And the government points us to some Fifth Circuit decisions interpreting the "other means" language just that way.  *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir. 2009); *United States v. Jackson*, 220 F. App'x 317, 332 (5th Cir. 2007).  But we do not believe that "other means" sweeps so broadly.  To interpret it as such would be to ignore the traditional interpretive practice of reading ambiguous and broad items in a list with reference to the more specific items listed.  *See United States v. Douglas*, 634 F.3d 852, 858 (6th Cir. 2011).  And, given that many anti-kickback violations involve a defendant paying others for referrals, such an interpretation risks requiring district courts to apply the mass-marketing enhancement for nearly all convictions under the anti-kickback statute.

Because Sandra's only marketing was word-of-mouth marketing, the district court erred in imposing the mass-marketing sentencing enhancement. Accordingly, we vacate Sandra's sentence and remand to the district court for resentencing.

## VIII.

Finally, Calvin challenges his sentence—both his term of imprisonment and his restitution amount. The district court found that the loss attributed to Calvin was $2,103,544.81, producing a sixteen-level increase in Calvin's offense level. *See* U.S.S.G. § 2B1.1(b)(1)(I). The district court also held Calvin jointly responsible with Sandra for restitution in the amount of $1,391,649.80. While we find no error in the district court's calculation of Calvin's restitution amount, we agree with Calvin that the district court miscalculated his offense level. Accordingly, we vacate Calvin's sentence and remand for resentencing.

## A.

The Sentencing Guidelines instruct district courts to impose a sixteen-level increase to a defendant's offense level if the loss caused by the conduct exceeds $1,500,000. U.S.S.G. § 2B1.1(b)(1)(I). When determining the amount of loss attributable to the defendant in a jointly undertaken criminal activity, the district court should include only loss that resulted from the defendant's own criminal conduct and any conduct of others that was "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of the criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." *Id.* § 1B1.3(a)(1)(B).

Calvin argues that the district court considered conduct outside his relevant conduct when setting his loss amount. "[W]hether conduct constitutes 'relevant conduct' . . . is reviewed *de novo*, while the underlying factual findings regarding whether that conduct is 'within the scope' of, 'in furtherance of,' and 'reasonably foreseeable' in connection with jointly undertaken criminal activity are reviewed for clear error." *United States v. Moody*, 787 F. App'x 857, 868 (6th Cir. 2019) (alteration in original) (quoting *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018)).

"[T]he scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000) (quoting *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993)). Instead, for purposes of determining relevant conduct, the scope is limited to "the scope of the criminal activity that the particular defendant agreed to jointly undertake." *Donadeo*, 910 F.3d at 895. A few months after the district court sentenced Calvin, we "[took] the opportunity to state more clearly what is relevant when determining" the scope of criminal activity that the defendant agreed to jointly undertake. *Id.* We counseled district courts to consider "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *Id.* (quoting *United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011)).

While we cannot fault the district court for failing to methodically apply the then-unannounced *Donadeo* factors, we must agree with Calvin that the district court employed too broad a standard for determining his relevant conduct. At the sentencing hearing, the government and Calvin disputed whether Calvin could be held responsible for the full amount of loss occasioned by sales of power wheelchairs accomplished by Sandra paying Cindy Mallard to forge prescriptions in Perry's name. The district court sided with the government, explaining:

> Mr. Bailey was found guilty of . . . conspiracy. And as the attorneys are well aware, once you're involved in a conspiracy -- a conspiracy is really nothing more than an agreement to engage in unlawful activity. And then once that occurs, and you're a part of the conspiracy, then you can be held liable for the acts and actions of the other co-conspirators throughout the duration of the conspiracy, unless there is some indication that you voluntarily withdraw or remove yourself as a part of the conspiracy. And we don't, to my knowledge, we don't have that type of situation in this case.

DE 425, Sentencing Tr., Page ID 5286. While the district court's description of conspiracy liability is correct, we have explained that "relevant conduct" in jointly undertaken criminal activity for Sentencing Guidelines purposes is not as broad as conspiracy liability. *Donadeo*, 910 F.3d at 895; *Swiney*, 203 F.3d at 402. Instead, under the Sentencing Guidelines, the

defendant can only be held accountable for the "the criminal activity that the particular defendant agreed to jointly undertake." *Donadeo*, 910 F.3d at 895. This error of law requires that we vacate Calvin's sentence.

The government disagrees, arguing that the *Donadeo* factors produce the same result. Were the district court's error that it did not anticipate and address the *Donadeo* factors, remand would be unnecessary. *See Moody*, 787 F. App'x at 868–69. But our qualm with the district court is that it applied the wrong legal standard. The district court's improper calculation of the loss amount was a procedural error that resulted in a sixteen-level increase in Calvin's sentence. Remand is therefore necessary. *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010).

### B.

Calvin also argues that the errors that marred the district court's amount of loss finding also infected the district court's restitution order.[3] We review the district court's restitution order for abuse of discretion. *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009). The government has the burden of proving the amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Calvin's argument is unavailing. The district court erred in calculating Calvin's amount of loss by using conspiracy principles. But a district court does not err by using conspiracy principles to determine a defendant's amount of restitution. Indeed, we have previously rejected a defendant's argument that he should not be held responsible for restitution in a conspiracy case because "his particular actions did not cause the victims' losses." *Bogart*, 576 F.3d at 576.

Nor is it incongruous to order an amount of restitution that reflects the loss caused by the entire conspiracy, even while simultaneously finding an amount of loss that reflects only conduct closely related to the defendant. The Mandatory Victim Restitution Act ("MVRA"), not the Sentencing Guidelines, governs restitution awards. 18 U.S.C. § 3663A. And amount of loss and

---

[3]Calvin further argues that, because the statutory maximum restitution amount is zero dollars and thus any restitution award constitutes an increase in a defendant's statutory maximum restitution sentence, the Sixth Amendment requires that "a jury, not the judge, must determine the amount of restitution." 18-5901 CA6 R. 41, Appellant Br., at 40. This circuit has already held otherwise. *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005).

restitution serve different purposes. "[Restitution]'s purpose is to make the victims whole; conversely, the Sentencing Guidelines serve a punitive purpose." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (quoting *United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004)). That a defendant played a minor role in a conspiracy and warrants a lesser punishment does not change the amount of loss sustained by the conspiracy's victims. Finally, the MVRA has its own method of responding to the unique issues of culpability posed by conspiracy: where multiple defendants are responsible for a victim's loss, 18 U.S.C. § 3664(h) allows the district court to make multiple defendants jointly responsible for payment of restitution or to apportion to each defendant her own share.

Finally, Calvin argues that the district court should have addressed his argument that the restitution amount should be apportioned between him and Sandra, not applied jointly. But we have previously held that, while a district court "has the option" to apportion restitution payment among defendants in conspiracy cases, it "is not required to do so." *Bogart*, 576 F.3d at 576; *see also United States v. Kolodesh*, 787 F.3d 224, 242 (3d Cir. 2015).

IX.

For the reasons stated, we affirm the convictions of Bryan, Sandra, and Calvin Bailey. We also affirm the district court's restitution order to Sandra and Calvin. We vacate, however, the sentences of Sandra and Calvin and remand for resentencing in accord with this opinion.